First matter is Mack versus the Warden of Loretto and others. Ready to proceed? May it please the Court, my name is Sean Andrews Sear, Court Appointed Counsel for the Plaintiff Appellant Charles Mack, and I am pleased to introduce third-year Duke Law student Russell Taylor, who will present argument on behalf of Mr. Mack this morning. Great, thank you very much. Good morning, Mr. Taylor. Good morning. Oh, go ahead. May it please the Court, I'm Russell Taylor, and I represent Mr. Charles Mack. With the Court's permission, I'd like to reserve two minutes of my time. Okay. Thank you. Let me just note, I'm not a Duke fan, but that will have nothing whatsoever to do with the decision here. Thank you. I'm an anti-Duke fan. It relates to sports, though. It does. Primarily because of what happens between circus and lacrosse and football and lacrosse, but go ahead. Thank you, Your Honor. Charles Mack is a devout Muslim and a federal inmate in F.C.L. Loretto. He appeals the District Court's 12-B-6 dismissal of his civil rights action that advanced several claims, which I intend to address today in the order in which we brief them, starting with Mr. Mack's First Amendment retaliation claim. Okay. First Amendment as to the redress of grievances petition or the freedom of religion petition? The petition, Your Honor. Okay. The District Court was incorrect to conclude that Mr. Mack's serious grievance was somehow unprotected simply because he conveyed it orally rather than reduce it to writing. Prisoners retained their First Amendment right to petition the government for redress of grievances. There's also an exhaustion issue. You're focusing on the fact that the oral presentment, but I cannot imagine what else this guy could have done. I mean, he made the oral presentation, and then I guess there was a chain of paper procedures that you have to resort to. He did that. He then appealed it. Even if you're wrong about the oral presentation, I'm not suggesting you are, but do we have to worry about that when he has the other things that he did in terms of filing in a manner that was consistent with the prison's own grievance procedure? Yes, Your Honor, because the retaliation occurred before he turned to the written grievances. Okay. As the Supreme Court said in Guarnieri, this right to petition, it's not limited to petitions lodged in a formal process. And this Court protects, as part of that right, inmate grievances about prison conditions. But here, defendants attempt to carve out from that protection, as a matter of law, all oral grievances simply because they were conveyed orally. But the defendants ---- Should we consider what type of grievance is worthy of protection? I mean, we get motions and letters from prisoners presenting grievances of all types. Too many pancakes are not hot enough. Not enough oranges. Too many pancakes. How do you cabin that so only the meritorious grievances can be considered for constitutional protection? Well, not every oral grievance would be protected, just like not every written grievance is protected. It still has to be conveyed in a manner that is appropriate for a prisoner's status. And we actually do present the Court with a limiting principle. First, it has to be a petition. So it has to be seeking to redress a problem, not merely complaining. And it has to be legitimate. By that we mean it has to go to BOP policies, which were designed to protect inmate rights. So what kind of example can you give me? I mean, should we, for example, consider the grievance to have as an element a matter of public concern? No, Your Honor. We ask this Court to reject the public concern standard just like the Seventh Circuit did and just like no other circuit applies. Our standard is, I believe, more in line with the Penal Logical Interest Test. Basically, if a prisoner clearly presents a right, invokes a right, and asks for help in protecting that right, like here, that should be protected. So the BOP grants prisoners the right to avoid disparagement on the basis of religion. And Mr. Mack presented that grievance orally. He said, I'm being harassed. Please help me. So the prison regulation says thou shalt not intimidate or affect prisoners' religious freedom. Exactly, Your Honor. And you claim that that's exactly what he was complaining about. Yes. So when you're dealing with prisoners, you have a question of credibility. Many of them are, in fact, convicted of crimes that involve false statements and false representations. And if you require that the petition be in writing, in the world of the prisons, aren't you a lot sure that you're going to be able to treat the grievance and to not wind up months later with a prisoner saying, I said this, and the correctional officer saying, no, you didn't, you said that? Yes, Your Honor. I do understand the concern. But in other contexts, oral grievances are protected just like written grievances. A concern about fabrication has been rejected, for example, under whistleblower statutes. And it's important here to note that F.C.I. Loretto may have actually encouraged inmates to bring their complaints orally. We cite to the F.C.I. Loretto handbook, which is not in the record, but it is on the BOP's website. And in that handbook, it explicitly says that inmates are encouraged to bring complaints to prison officials at mainline, which we understand to be lunch. And it would make no sense, as the Seventh Circuit said in Pearson, for the prison to offer out this process to grieve and then punish inmates for using it. Isn't someone stationed there, stationed may be too strong a word, stationed in the lunch line for that specific purpose, some prison officials there specifically to receive inmate grievances? That's not in the record, Your Honor, but that's how we read the handbook. Okay. In the handbook, even if this Court did not take formal notice of the handbook, it does undermine the argument that the prison has this penological interest in prohibiting and punishing all oral grievances. That would make no sense. Could you tell me how Yost, Kuhn, and Stevens are implicated in this case? They're supervisors. They were apparently not directly involved in any of the conduct that Matt complains about. So as to Yost and Kuhn, we are not asserting supervisory liability or damages in their official capacity. But Stevens was involved. In this pro se complaint, Mr. Mack says that he reports to Stevens. Stevens was a commissary supervisor? Stevens was the trust fund supervisor. What exactly is that? Is that the person who takes care of the money deposited for the inmate at the commissary? We understand it to be a supervisory position above that person. So as Mack pleads, Roberts is the commissary foreman. He's the authority there. Fenselowski is in charge of the bank accounts. And then Stevens supervises them. What does Stevens do? We believe he supervises him, but we don't have much more than that in the record. That's not enough to implicate him in this case, is it? That wouldn't be enough. But first, Mack did report this grievance to Stevens, and then he was fired. So he did plead enough at this stage for the pro se complaint that he was personally involved. Are you saying that Stevens is the one who made the decision to deprive him of his job in the commissary? We don't know, Your Honor. Well, again, how do you then get past the pleading requirements if you don't know? There's got to be something in the record to justify holding him in the case, hasn't there? For the 12-6 stage, we believe that Mr. Mack has pled enough by saying that he reported this complaint first to Stevens and was then fired. And, again, Stevens was the supervisor of these two individuals, and we don't know whether he was involved in the firing or not. Maybe you can help me with the Bivens pre-exercise claim. What authority is there, especially since you have a valid, at least on paper, I'm not sure what your point would be with you, but a colorable RFRA claim? Given Congress's enactment of RFRA, isn't that exactly what the Supreme Court has told us we ought to look to before we find a Bivens action exists? So we do ask this Court to extend Bivens to the free exercise clause, so we should run through the Wilkie two-step framework. And at step one, as we read Wilkie, the question is not whether there's some process, but whether Congress intended for that alternative remedy to displace a Bivens hand, whether Congress intended for the judiciary to stay its Bivens hand. And if we look to RFRA, it is comprehensive, but it's hard to infer that a Congress concerned with protecting religious liberty, a Congress that was motivated by a belief that the judiciary was not doing enough, that that Congress intended for petty harassment and nonsubstantial burdens. Isn't it fair to say that RFRA is aimed at laws, regulations, or policies that may affect religious freedom or an incidental burden on religion, not individual conduct? No, Your Honor. Congress enacted RFRA to root out. That's not true? No. It certainly goes to laws, but it also goes to discrete action, because Congress enacted RFRA to root out substantial burdens in all cases. But aren't you saying that this is a substantial burden, that Mr. Mack had to stop praying during his working hours because he was afraid of the reaction? And as I read your brief, you're saying that this is a substantial burden. Yes, Your Honor, because it's important to remember that Roberts is the authority in the commissary. That is his domain. And he signaled to other inmates and to Mack that Mack's faith was not acceptable in his domain. Why isn't that RFRA? Probably. Not suggesting he prevailed there, but at least probably, why isn't that exactly the kind of thing RFRA was aimed at? And if that's the case, how can we find a Bivens action? Isn't it a substantial thing, as you said, RFRA is aimed at? Correct. I was answering Judge Roth's question about RFRA. So in RFRA, you need a substantial burden, and we believe that's here because Mack feared for his safety and then did stop praying in the commissary, and that's a substantial modification. But you do not need a substantial burden for a free exercise. And for Wilkie, Step 1, to go back to my earlier point, it is about congressional intent, and it's hard to infer that intent here from a Congress seeking to protect religious liberty. But even if this court was left at equipoise at Step 1, under the Wilkie framework, it should still move on to Step 2 and ask whether there are special factors, a counseling for hesitation here. Defendants cite to prison as a special factor, but they cite to no case where prison was deemed a special factor. In fact, in Carlson, the Supreme Court said that prison officials do not enjoy a special status in our constitutional scheme, so there are no special factors in prison cases. Go ahead. It doesn't appear that there is a law specifically on point covering the case, that the law was clearly established. So why aren't the defendants entitled to qualified immunity? As to the retaliation claim, two points. First, it would not be reasonable for an officer to believe that he could retaliate against an inmate for a legitimate grievance just before he reduced it to writing. And second. What was he? What essentially was the retaliation? He fired him from the prison commissary and falsely accused him of misconduct. Okay. And secondly, no reasonable officer can believe that a grievance conveyed as part of a process, part of the administrative process, is unprotected. So here, the court should ask, what are the processes that F.C. Alleredo held out? So if F.C. Alleredo encouraged inmates to bring their complaints orally, that would be part, that would be an administrative process, and that would be protected, and that's clearly established. Are you in a rock-and-a-hard place on the Bivens versus Riffran? I've thought about it. And part of this is crystallized by your response to my colleague's softball that he took a cold strike on. To the extent that you can argue that you've got a Riffra claim on retaliation, doesn't that significantly undermine whether or not we can find a Bivens claim there, and vice versa? The extent there's a Bivens claim does not, that comes with finding a Riffra claim. Yes, Your Honor. It is a hard argument to make. But again, and I see my time has expired. Go ahead. But it goes back to congressional intent. What can Congress intend when it passed Riffra? Did it intend to leave unprotected, petty harassment and burdens that do not arise to the substantial level? You're saying this is a substantial burden. Yes, Your Honor, we do. And here we think that he has both a Riffra and a Bivens claim. Of course, eventually he'll have to pick between the two. But if you answer the question you just hypothetically asked, if that was Congress's intent, then Riffra would reach this. Yes, Your Honor, if Riffra did intend to displace a Bivens remedy for free exercise, certainly Riffra would be Max's only recourse. Is your strongest argument that this is a constitutional First Amendment by retaliation based on the First Amendment issue? I think they're all strong arguments, Your Honor. But the retaliation is separate. The religious-based claims, for the most part, deal with what Max suffered before he was terminated from the prison commissary. Thank you. Thank you very much. We'll hear back from you again on rebuttal. Ms. DiTillo, is it? Yes, Your Honor. Good morning, Your Honors. Good morning. May it please the Court, Jane DiTillo, on behalf of Defendants Yost, Kuhn, Stevens, Roberts, and Veseloski. The allegations in this case are disturbing. But if we go through each of Plaintiff's claims, we see that he does not state any federal constitutional claim or a statutory claim. And I'll start with the oral petition retaliation claim. As Your Honor acknowledged, there is an exhaustion issue here. What could he possibly have done that he didn't? I mean, talk about dotting I's and crossing T's. This guy was not only dotting I's and crossing T's, he was polishing the font. He does the oral presentation. He goes through all these chains in terms of the written presentations. He then takes an appeal from that written denial. He then appeals that. What more could this guy have done? For the facts that he grieved, he certainly exhausted the procedure. And that's why we're not raising this as to any of the free exercise claims. However, for the oral complaint, that is never mentioned in any of his written grievances. And the Supreme Court has recognized that a very significant purpose of the PLRA's exhaustion requirement is to allow prisons for cases that eventually go to litigation to clarify the contours of the controversy. And here, had Plaintiff grieved the fact of his oral complaint, the prison would have been able to clarify the contours on two key factual issues for defending this action. First, was there an oral complaint in the first place? What did it involve? You have no problem with the complaint being oral? We do have a problem with that. But, again, even if oral complaints are protected, then he did not exhaust as to the oral complaint because he didn't allege it. They never were able to determine who knew what, when, when they took the adverse action. I was thinking, I don't know about Mr. Mack in this case, but, you know, not every prisoner can write. And I say that because I've read some of their efforts. Writing is painful to the court. But what do you do in that case? Well, in that case, we're not requiring that the written grievance be sophisticated. But I do understand your concern that we don't have total literacy. But those cases, I think the BOP has measures for inmates to be able to make written grievances. Otherwise, they would never be able to file a case in federal court. An inmate can get help from other inmates from a caseworker. In this case, on the facts we have, there's no question that Mack made an oral complaint concerning the sticker that was put on the back of his shirt. Yes. And we are, our position is that oral complaints should not be protected by the First Amendment's petition clause. Why do you go through this procedure of encouraging oral complaints? Let me back up. Do you concede your opponent's argument that the prison does, in fact, the system, the Bureau of Prisons, encourages inmates to bring their complaints orally, informally, I guess is the term in the BOP rules, in order to try to reach an early resolution of it? It does appear that way. But assuming that it does, that rule is clear, that encouragement is clearly aimed at facilitating communication and solving problems. If we, if this Court determines that all oral complaints are constitutionally protected, that could have a chilling effect on that type of fostering of communications. If individual- Because here we're talking about an oral complaint about an alleged constitutional deprivation. I'm not sure that the parade of horribles that you want us to buy into is appropriate, given the facts here. I'm sorry? You bring in the parade of horribles, and if we allow this, the horses out of the barn, the cows are out of the barn, everybody's out of the barn, because we open up the floodgates. But he is specifically orally alleging a deprivation of a constitutional right. That's not your ordinary, the barber messed up my sideburns when I went to the barbershop. Even if we limited the protection of oral complaints to complaints about constitutional rights, and we also believe that his complaints did not allege deprivation of a constitutional right. Or a violation of your own policy. An oral petition about deprivation, a denial of the Bureau of Prison's own policy, because your policy precludes religious discrimination. I don't know that that would be a workable limiting principle, because the policies are very broad. They prohibit unprofessional conduct, unethical conduct. What about the one that goes to religious discrimination? If we limited, even if we limited oral complaints to just complaints about violations of policies against religious discrimination, we still have the problem that Judge Roth pointed out, where we have the risk of not only a fabrication, but also the fact that oral statements are disruptive in a way that written statements are not. Did you say fabrication? Yes. We have the risk of fabrication. It opens up an intent. What do you do with the court system, then? Because you can make the argument, look, we don't allow all these people to come in and file these lawsuits. We've got a risk of fabrication. You can make the same argument for any process that is designed to settle disputes. If you let them bring in disputes, they could lie. That is absolutely true, Your Honor, but I think it's a factor to consider. We'd all be out of work. I'm sorry? We'd all be out of work. I think it's a factor to consider in examining the reach of the First Amendment, especially where you're creating an entirely new factual dimension in these cases about what was said, when, to whom, how it was said. I think a good example of this is the Watkins v. Casper case in the Seventh Circuit, where it was very meaningful to the Seventh Circuit that the oral statements were made in a loud voice with active hand gestures. Wait. You lost me there. You're concerned about disruption. Yes. Now you're suggesting that the louder the complaint is made, the more likely it is to have some gravitas to it? No, Your Honor. I'm saying that that complaint was not protected speech, but one of the main concerns of the Seventh Circuit is that the oral speech that was the subject of that retaliation claim in Watkins v. Casper was particularly disruptive in a way that filing a written grievance is not. And that's why we think that even if a complaint is legitimate, it's to broadly hold that oral complaints are protected. You really run into those problems with oral statements. The problem in Watkins was that the complaint challenged the librarian's policies in front of other prisoner clerks. Yes. And that threatened disruption. Do we have anything like that here? I thought it was just that he went up to someone whom I assume under the prison totem he should have gone up to, and he complained about what was done to him based upon religion. How is that anything akin to threatening or challenging a librarian's policies in front of other prisoner clerks? On these facts, we don't have allegations that he was, we don't have a factual record to show that he was confrontational or disruptive in his complaint. That's true. But my point is that if we cover all oral complaints, even if they are complaints about a prison policy, then those problems can arise in other cases. So we really believe that this, it's very difficult to come up with a workable limiting principle that takes all of this into account. And it's especially important for prisons to be able to limit speech within, oral speech within the work assignment context, where prisoners are given access to locations and materials in the prison. They're given sometimes power and control over other inmates. So it's important for them to be able to take action based on speech that falls short of being abusive or something like that. And, again, another way to dispose of this claim is on the qualified immunity prong. You can consider that the right was not clearly established before considering whether any right was violated. You don't want to go down that road? Which right are you talking about was not fully established? The right to make an oral grievance. Okay, all right. Okay. You're not going down the road and thought you were going to go down, which is good. Okay. I'm glad. So I'll move on to the free exercise claim, unless the Court has any other questions about the oral retaliation. Here, the essence of his free exercise claim and the substance of his referral claim. Does the prison have a requirement that all grievances be in writing? For the administrative remedy program, yes, those grievances must be in writing. They must use the administrative remedy program forms. Just if you're seeking administrative remedy. Yes, and that is the formal grievance process at the prison. It must be exhausted to meet the PLRA's exhaustion requirements. For the free exercise claim, these claims are really based on a subjective chilling effect of conduct that is not prescriptive. It's not compulsory. That's not enough to state a claim under the free exercise clause or RFRA. And here The free exercise, now you are talking about religious, that First Amendment prong, not the petition part of the First Amendment. Yes, I'm talking about the free exercise prong. Well, I have a problem. If the second statement had not been made, maybe there'd be some force to your argument. But given the second statement, that the only good Muslim is a dead Muslim, how can that not possibly be? I'm not sure I remember correctly what you just said, but if that's not chilling, I'm not quite sure why you're in a prison context in front of other prisoners, Is it illogical for Matt to interpret that comment as the prison authority is giving the inmates license to tune them up one night? If not worse. We believe that that is a stretch. Why is that a stretch? I'm in a prison. I'm surrounded by my colleagues, all of whom are in prison because they did something to get there. Let's assume for trial human error, 99% of them are there because they did something to get there. And someone who is not a guard necessarily but in an administrative position says, the only good Muslim is a dead Muslim. I'm a Muslim. And I'm surrounded by folks. I assume some of the folks who heard this are quite capable of acting on that. Why wouldn't that show me? It seems to me that I don't think I'm all that sensitive or cowardly. But if I were a practicing Muslim in a prison and I heard a prison official say, you know, this guy, the only person like him that's any good is dead, when he's dead, and I look around and I see guys with biceps bigger than my chest, that would sure suggest to me maybe I shouldn't pray when I'm in the library. If you choose to not pray, that still is not a restriction on your right to pray, especially where the prison has provided a space for you to pray. That comment is certainly deplorable. But it simply does not the subjective chilling effect that the prisoner alleges is simply not enough. And I think that we have to look at that allegation that he didn't want to pray in his response to the motion to dismiss. He didn't say he didn't want to pray. He was afraid to pray in the library. That he stopped praying in the library and that he waited until he got home. He said that in his response to the motion to dismiss. But if we're considering that brief, we should also consider his motion for reconsideration, where he explicitly said, I am not arguing that my practice was burdened in any way. He made clear after the district court had set forth the standard for pre-ex- And this is on page 71 of the appendix. He made clear that the district court had set forth, said, you know, he did not allege that he wasn't allowed, that he wasn't able to pray, that he wasn't able to practice his religion. He said, my complaint is based on petty harassment. He took issue with the district court's interpretation of Brown, that petty harassment is not enough for a free exercise claim. But he doubled down on saying that he was not alleging that his exercise was inhibited. So we have to, and the district court on page 24 of the appendix and its decision on the motion for reconsideration took that into account in holding that any amendment would have been futile. So again, you know, and I think it's even harder to state a RFRA claim on these facts. Because RFRA does not bar discrimination. It bars a substantial burden on practice. And that's simply not alleged in this case. We, again, we believe that a Bivens remedy is not appropriate in any case for the free exercise clause as we've stated. The test for, the Wilkie test is not whether there is a remedy. There was not a remedy for the plaintiff in Wilkie, in Bush, in Shaliki, or in Chappelle. The test is whether there's process for those types of claims. And there is here with RFRA. There's process. The test is also, and also with the administrative remedy program, the test is also what is Congress's intent with respect to this type of litigation. And it's clear from the combination of RFRA and the PLRA that Congress did not intend for there to be a federal right of action in this area. And we also believe that the nature of the free exercise clause and the history of the way that that's been enforced, aside from the 1983 context, suggests that there should not be damages claims against even individual defendants. Is it the case that Mack has no remedy at all? It is the case, but that doesn't mean. Is it because of qualified immunity or because there's no right to petition and he has no redress for the complaint that he made about the sticker that was put on the back of the shirt? It is both on the merits and because of qualified immunity. He has process. He complained to the BOP about the violation of BOP. What he alleged was the violation. So your argument is that he failed to exhaust administrative remedies? As to the oral complaint, yes. But we believe that he had the administrative remedy program created a process for him, and that's what the Supreme Court requires in Wilkie, not that there is a remedy for these particular claims. In terms of the qualified immunity, how could an officer not have known that this was inappropriate? He may not have known specifically which facet of the statutory or constitutional law he was running afoul of, but how could, in a prison context where your own handbook and procedures require you to honor someone's religious beliefs, how could an officer not reasonably have known that the right to practice one's religion is clearly established and that slapping some sticker on the back, which basically demeans the person because of their religion, and then later on saying that you should be shot because of your religion, you should be killed, you didn't specify the manner of execution. How could that possibly be something that's not clearly established? Do you really want to argue that? I'm sorry? Do you really want to argue that? Yes, Your Honor, because we believe that clearly the right to free exercise is clearly established, but you have to look at the specific, very specific context, according to the Supreme Court's decisions in Reichel. But I thought I just laid out the context for you. Right. You conclude this guy because of his religion. So the question is, does this type of harassment violate the free exercise right? And that is not clearly established. That's a scary thought. But Officer Roberts knew, with prison regulation, that you shall not harass inmates based on religion. Right. So the qualified immunity test doesn't ask, does the officer know that his conduct is wrong or inappropriate or against agency regulations. It asks whether the specific constitutional right is clearly established. And you're saying that the folks you choose to employ for administrative positions in the prison system are not the kind of folks who would understand that one's freedom of religion is clearly established. I think that the freedom of religion is clearly established. But your folks wouldn't understand that. A reasonable prison official in Pennsylvania would not understand that. That's what you're arguing. No, Your Honor. I'm arguing that the question for qualified immunity purposes is whether the free exercise clause includes the right to be free of religiously-based harassment, and not whether religiously-based harassment is okay. Is the answer to that yes, by the way? No, it's not. The free exercise clause does not embrace that you have a right to be free of harassment on the basis of your religion? To be free of two instances of harassment by a specific guard, that's not part of a practice or policy. The free exercise clause, it's not directed at a specific exercise of religion. I thought you were saying you can freely exercise your religion even though you are harassed in the exercise of that religion. If you have two discriminatory statements, like you do in this case, which are wrong, clearly, you can still exercise your religion. What if the, what if, was it Polanski? Who was the one who made that statement, was the only good Muslim? Allegedly, that was Roberts. Okay, what if Roberts had said, the only good Muslim is a dead Muslim, and by the way, I got a carton of cigarettes for anybody who wants to help me out with this problem? I think that that would be a very serious threat. That would be a criminal matter. That would be possibly an Eighth Amendment. Why would it be criminal? Because that would be inciting, basically seeking a contract killing, essentially. If it's gratis with no compensation or consideration, it's okay, but if you add the contractual element of consideration, it's not okay? Well, I think that if you have this general threatening statement, it's very wrong. I'm not doubting that it was significant to the plaintiff, that it was scary to him, but when you add a mechanism for completing it, that's when a threat takes on, I think, a clearer nature and becomes more threatening. But I think that might be more of an Eighth Amendment issue or a criminal issue than a free exercise issue, even in that case. Wherever you hang that right, you would concede that a reasonable prison guard would be on notice that that right was clearly established, whether it's Eighth Amendment, First Amendment, wherever you find it, Fourteenth Amendment, Fifth Amendment, that right is clearly established. You don't suggest that if you take care of this guy tonight, there's a carton of cigarettes waiting for you in the morning. That would be wrong. I think it would be wrong, but the question is, what is the specific constitutional right? And that's the question that we have to ask. What case says that, that you have to not only know it's clearly established, you've got to know the specific text of the Constitution? That would be RICO, or the specific context. That would be RICO, which we cited in our response brief. But it's context, though, not necessarily the specific text of the Constitution, isn't it? Right. It's what is the specific. I don't know if it's the text, but it has to be the specific right, whether it's free exercise. And that's how we ask the question of whether it's a clearly established right. I don't think you can ask that without referring to a specific constitutional provision. Let's put the consideration back in, as you saw from the carton of cigarettes. The defense would be, oh, my goodness. I thought that was in the 15th Amendment. Therefore, there's no clearly established right. You're telling me it was the 8th Amendment. I thought it was the 15th Amendment. I'm wrong. But I didn't know it was clearly established because I got the wrong number. It's not a subjective test. The question is whether a reasonable officer would have known about the clearly established right. So in that case, you know, I don't think that an individual defendant could say, I didn't know the specific context. Here, you know, we understand that these are very disturbing allegations. And, you know, I think the 8th Amendment provides an interesting perspective because there are a lot of 8th Amendment cases with really, really deplorable conduct, with guards spitting at inmates, with guards being inappropriate during strip searches. And those things are simply not constitutionally protected in those cases. Under the 8th Amendment. Yes. But the principle is that you can have, you know, very disturbing conduct that doesn't rise to the level of a constitutional claim. And that's what we have here with the free exercise. You're saying even my contract killing scenario is 8th Amendment, not First Amendment. Is that what you're arguing? That was just thinking out loud. I don't know that the contract killing, I think that the, you know, it becomes more of a threat, a direct threat, if there's sort of an implied telling another inmate to do it, as opposed to just making the statement itself. Okay. Very interesting argument. Thank you. Thank you, Your Honors. We ask that you would affirm the District Court's dismissal. May it please the Court. After Roberts made the no good Muslim but a dead Muslim comment, Mack did what any of us would do. He sought help for which he was punished, and he stopped praying. He did not want to put himself on display in front of these other inmates who defendants tell us are prone to violence. They have little regard for safety. And he sought help potentially through a process that F.C. Alleredo held out for him. And as Pearson said, the Seventh Circuit said, it would make no sense for the prison to hold out this process to grieve orally and then punish him for using that process. Well, she's not suggesting he was punished for using the process. She says that the process wasn't sufficient to trigger the kind of remedy that he's seeking.  You're correct, Your Honor. But leaving those oral grievances unprotected leaves them open for the kind of retaliation that Mr. Charles Mack suffered here. I would like to clarify one more thing about free exercise clause. That's a fallback. If Mack cannot establish a substantial burden, he still has the free exercise clause violation. But we contend that he has established this. And to conclude, the upshot of defendant's argument, as you noted, is that Mr. Mack would have no remedy for very serious constitutional violations. But prison walls do not form a barrier separating prisons from the protections of the Constitution. That was the Supreme Court in Turner, and we believe that this Court should reverse and remand the district court's decision. Let me ask you one question about Bivens. The Supreme Court has extended Bivens only in the Fifth and Eighth Amendment context. Do you know of any court of appeals that has extended Bivens to First Amendment context? Claims? For retaliation, this Court has extended it. District court. District court. No, this Court has extended it for retaliation. But, no, no circuit has extended it for free exercise. But this Court should under the Wilkie framework. Thank you. Thank you. Thank you.